Russell Gr. Hunt, J.
These two claims involve an identical issue and they differ only slightly in their facts. The sole issue is the construction to be given to the provisions of four contracts respecting claimants’ fees. The claims were tried together upon a single record. Such was the stipulation. The claimants do not contend that they ought to be paid for services as for breach of contract. They contend simply that there is a balance owing to them, under the contract, for the services they performed. The State raises no question about the services having been completed, expertly and well.
The claimants proceeded first with respect to claim No. 33850 in which they seek to recovér a balance for engineering fees under two negotiated contracts with the State (H. C. 2122 and H. C. 2258) relating to engineering work for the construction of sections of the Thruway System. Claim No. 33849 seeks to recover a balance allegedly owing under two negotiated con *750 tracts (H. C. 2619 and H. C. 2621) with the State Thruway Authority for like work for road construction supplementary to that embraced in the aforesaid two contracts with the State.
The contracts provided that the claimants were to do the engineering work of preliminary surveys, plans, estimates, specifications and rights of way maps (and other work not necessary to detail). The work was divided into four parts in the order of (1) surveys and maps (called “ part 1 work ”);
(2) preliminary plans and estimates (called “ part 2 work ”);
(3) detailed contract plans, design drawings and itemized estimates of the construction cost of each project (called “ part 3 work ”), which were to be “ computed at current prices as used by the Department of Public Works ” (so, in the two contracts with the State — and, substantially the same in the two contracts with the Authority, for, according to claimants’ witness, Beck, all four contracts “intended the same meaning”); and, (4) a general map and individual rights of way maps (called “ part 4 work ”).
The claimants were to be paid for each part of the work separately and as the parts progressed. The dispute arises in connection with the fees for the design work (pt. 3 work). For this work the claimants were to be paid “ 3%% of the estimated construction cost at current prices, of the project as approved by the Superintendent ’ ’, or, in the case of the contracts with the Authority, by the chairman thereof; these all ‘ ‘ intended the same meaning ”, Mr. Beck testified.
The proof proceeded first with H. C. 2122, which was dated July 16, 1951 and executed on the same day by the claimants and on August 8, 1951 by the Superintendent of Public Works and approved by ¡the State Comptroller on July 25, 1951, as to - the amount expressly limited by the contract pursuant to section 112 of the State Finance Law, and by the State Budget Director pursuant to section 8 of the Public Works Law. The evidence adduced and the record so made was, by agreement, to be taken as the record in each of the other contract cases. These chronologically followed H. C. 2122. H. C. 2258 was dated October 31, 1951 and was executed by the claimants on December 10, 1951 and by the Superintendent on December 21, 1951; it was approved by the State Comptroller and the Budget Director. H. C. 2619 (with the State Thruway Authority) -was dated October 31, 1952 and executed by the claimants on January 28, 1953 and by the Authority on February 18, 1953. H. C. 2621 (also with the Authority) was' dated October 31, 1952 and executed by the claimants on January 28, 1953 and by the Authority on February 26, 1953. Each one of the contracts was amended by *751 one or more supplemental agreements, and, in each final supplemental agreement there was a clause reciting that the claimants did not waive their claims for the balance of fees allegedly due under each contract as to which claim had been made previously and refused.
The first work was performed by the claimants under H. C. 2122, and, claimants’ monthly estimate No. 1, of the work performed by them, dated August 17,1951 shows that for the period “up to and including August 17, 1951 ”, only part 1 work was performed to a small extent. The first billing for part 2 work was contained in monthly estimate No. 5, dated December 7, 1951 and the first billing for part 3 work was contained in monthly estimate No. 16, dated November 8, 1952.
When the claimants reached part three work and commenced the preparation of detailed estimates of the cost of the project they were then required to take and use prices furnished to them by the State. The claimants, protested and it appears that they were then ordered to perform in the manner required by the State and they complied. The prices which the State referred to in the contract and directed to be used were those which the Department of Public Works had compiled and published on a State-wide and district-wide basis, from the bids of successful bidders for State construction contracts and the claimants knew this. Exhibit 36, a letter dated August 28, 1952 to the claimants from the district engineer, refers to the discussions which had been under way between the parties with respect to the prices to be used in compiling claimants’ estimates of construction cost (see, too, exhibits H and I, dated respectively Sept. 29, 1952, and Oct. 17, 1952). Claimants complain that as of the date of the contract (July 16, 1951) it was not known that the State would require them to use prices which were not then in existence because such prices were the 1951 prices compiled from bids submitted for jobs which were not let until that year. It follows, therefore, they argue, that the use of such prices was not within the contemplation of the parties at the time the contract was entered into and not within the contract. The State argues, however, that it was only after part 1 work and part 2 work were finished or had progressed to the point where the claimants were ready to commence part 3 work that the State would be called upon the furnish the “ current prices as used by the Department of Public Works ”. The fact is that the part 3 work was not commenced until within the month before November 8, 1952 (the date of the monthly estimate which first included part 3 work; exhibit B) and the *752 State was not required to furnish its “ current prices ” prior to that time. The claimants knew that the State compiled and published “ current prices”, as aforesaid, and knew that the prices which would be furnished to them would be the latest. Since the claimants were not ready to proceed with the part 3 work until late in 1952 it is clear that the parties intended that only those prices which would be furnished would be “ current prices ”, which, in this case, were the 1951 prices. There is no complaint that the prices furnished were below the prices prior to 1951. Indeed, there could not be, because at the time the State furnished the 1951 prices it directed the claimants to increase such prices as of August, 1952 by a factor reflecting the upward trend in construction prices (exhibit H); no complaint is made concerning the factor except the complaint that the resulting price was not high enough. The claimants’ real complaint is that the State refused to permit them to use prices in the preparation of the cost estimates (which would be the basis for computing their fees) which they proposed to compile in the exercise' of their judgment, limited only by what they determined were “ market ” or “ going ” or “ realistic ” prices. As alternatives to be used in computing their fees, they have suggested that the State adopt either the prices which were used to arrive at the amount stated in the advertising for bids to do the construction work, or, the prices bid by the successful bidders. These alternatives are not well bottomed. The claimants were paid as the work progressed and when they submitted the estimates their work was finished, hence, this would preclude the use of any prices compiled from either alternative; further, they do not suggest the procedure which should be followed in the event a project should not be let or bids obtained. The project contemplated by H. 0. 2619 never reached the advertising stage and the construction work was not done.
The claimants’ position does violence to the wording of the contracts and was not within the intention of the parties at the time it was made.
It is significant that the claimants had H. 0. 2122 under consideration for a matter of months before it was executed. They received that contract on April 23, 1951, for the purpose of study anil then to confer with the superintendent on April 27, 1951. It was not executed by the claimants until July 16, 1951. The claimants conferred with the State’s representatives relative to the method of computing their feeis and their witness, Mr. Beck, relates that they were told the fees would be computed upon the engineers’ estimate of construction cost “ which will *753 be greater than any bid by reason of the requirements of section 38, subdivision 3, of the Highway Law ”. If this was an attempt at an oral understanding “ where a written agreement is contemplated”, it is insufficient (Rosensweig v. Salkind, 5 A D 2d 58). If it was intended to refer to a different method of computing fees than that set forth in the contract then such testimony is objectionable and the motion to strike out such testimony, upon which decision was reserved, is granted; although, claimants’ counsel stated the purpose was not to vary the terms of the contract. If the claimants thereby sought to establish another or separate agreement, then such efforts are abortive because not consummated according to law by public officers authorized to do so (Belmar Contr. Co. v. State of New York, 233 N. Y. 189); and, if it is claimed that it was the basis for an understanding or agreement to pay an amount in excess of that provided in the contract then such is unconstitutional (N. Y. Const., art. IX, § 10; Whale Oil Co. v. State of New York, 180 Misc. 1067, affd. 266 App. Div. 1043).
The claimants having signed the contract are now conclusively presumed to have known its contents and to have assented thereto (there being no fraud or other wrongful act alleged or proven) (Johns-Manville Sales Corp. v. Stone, 5 A D 2d 110; Matter of Gitelson & Sons [Weavetex Mills], 274 App. Div. 480; Metzger v. Ætna Ins. Co., 227 N. Y. 411, 416; Gram v. Mutual Life Ins. Co., 300 N. Y. 375). “ There is a presumption that no matter what the parties orally agreed, they agreed on what the writing said” (Metropolitan Life Ins. Co. v. Tannenbaum, 156 Misc. 221).
If the claimants had obtained from the State the concessions they sought and the kind of agreement they now contend for, it would have been extremely easy — and they had from the latter part of April, 1951 to July 16, 1951 to do so — to add a few words to accomplish this; this court cannot under the guise of construing a contract add language which the parties could have inserted had they so desired (Friedman v. Handelman, 300 N. Y. 188; Heller v. Pope, 250 N. Y. 132).
When the claimants executed the contract on July 16, 1951, almost three months after the receipt of the “ pro forma contract ” and the start of conferences thereon, they were fully conversant with the intention of the provision in question which was subsequently, and, when the occasion arose, followed by directions in writing consistent therewith, (exhibits 36, A and I). This applies as well to the other three contracts. In addition, it is quite obvious that when the contracts with the Thruway *754 Authority were up for discussion, the prior conferences relative to the meaning and use of ‘ ‘ current prices as used by the Department of Public Works ” were very much in mind. In fact, the provisions of the Thruway contracts (so far as relevant) are “ identical, mutatis mutandis, with those in the contracts with the State of New York * * * except for the provision of part 2 (d) of these contracts ” (claimants’ brief, p. 57) relative to the construction estimate. Unlike the State contracts (which called for but one estimate each) the Thruway contracts provided for two cost estimates, one of which was to be “ computed with neat quantities and at current bid prices, as used by the Authority at the time the estimate is submitted ’ ’ and the second estimate to be “ computed with rounded quantities, and current bid prices increased by percentages determined by the Chairman, shall be prepared for construction contract advertising purposes ”. The fee payment provision, however, limited the fee computation to the use of the first estimate. This the claimants argue resulted in the preparation of a ‘ ‘ fee estimate on a wholly fictitious basis and (claimants) were thus prevented by the Authority from submitting a fee estimate using neat quantities and the realistic unit prices that went into the construction estimate for bid purposes” (claimants’ brief, p. 72). Their complaint is that thereby they were paid a lesser sum than if they had been permitted to base their fee on the second estimate using “realistic unit prices ”.
It can be said, again, that if the claimants had succeeded in obtaining the kind of agreement which would have given them wide latitude in the fixing of their fees it would have been extremely simple for them to have added the words necessary to express the agreement; their absence leaves the argument without persuasion. The failure of the claimants to obtain from the State the kind of contract for which they contend is not due to any naivete on their p'art; for they are internationally known engineers who have for many years specialized in the design of highways and expressways for domestic and foreign governments and their established standing, reputation and experience negate artlessness on their part and over bearance on the part of the State.
The claims are dismissed. The findings submitted by all parties have been marked and returned to the clerk.
This constitutes the decision in the above-entitled cases pursuant to section 440 of the Civil Practice Act.
Let judgment be entered accordingly.